UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| FALCON PRODUCTS, INC., a ) | |
| Delaware corporation, et al., ) | |
| ) | |
| Debtors. ) | |
| _____ ) | |
| ) | |
| PENSION BENEFIT GUARANTY ) | No. 4:05-CV-2247 CAS |
| CORPORATION, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| FALCON PRODUCTS, INC., et al., ) | |
| ) | |
| Appellees. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on an appeal by the Pension Benefit Guaranty Corporation of an October 26, 2005 Order and Findings of Fact and Conclusions of Law (collectively the "Order")[1] of the United States Bankruptcy Court for the Eastern District of Missouri (1) determining that the financial requirements for a distress termination of the debtors' three defined benefit pension plans under ERISA § 4041(c)(2)(B)(ii)(IV) are satisfied; and (2) approving the distress termination of the three pension plans.

---

[1]The Order is titled, "Order Granting Debtors' Motion Seeking (1) A Determination That They Satisfy The Financial Requirements for a Distress Termination of Three Employee Retirement Income Plans; and (2) Approval of Termination of Such Pension Plans." The Findings of Fact and Conclusions of Law are titled, "Findings of Fact and Conclusions of Law Regarding Debtors' Motion Seeking (1) A Determination That They Satisfy The Financial Requirements for a Distress Termination of Three Employee Retirement Income Plans; and (2) Approval of Termination of Such Pension Plans."

The main issue presented in this appeal is: When an employer in a Chapter 11 bankruptcy proceeding seeks to terminate multiple pension plans under the distress termination requirements of 29 U.S.C. § 1341(c)(2)(B)(ii), does the statute require the bankruptcy court to apply the reorganization test to each plan individually, or to all the plans in the aggregate? The Bankruptcy Court concluded that the plans were properly considered in the aggregate and that the debtors' motion to terminate their plans should be granted. For the following reasons, the Court will affirm the Bankruptcy Court's Order.

## I. **Background and Parties' Contentions**.

The Pension Benefit Guaranty Corporation ("PBGC") is the federal government agency that regulates the termination of defined benefit plans under Title IV of ERISA, and guarantees the payment of nonforfeitable pension benefits up to statutory limits in those plans. PBGC insures the pensions of 44.1 million workers and retirees in more than 30,330 pension plans, and pays more than $3.7 billion annually in benefits to more than 682,820 participants of terminated plans and their beneficiaries.[2]

Falcon Products, Inc. and eight affiliated companies (collectively the "Falcon Group") voluntarily filed for protection under Chapter 11 of the bankruptcy laws in January 2005. The Falcon Group designs, manufactures, and markets furniture for the food service, contract office, hospitality, healthcare and education markets. The nine cases were consolidated for procedural purposes and were administered jointly in the Bankruptcy Court as Case No. 05-41108-399.[3] As part of the reorganization, the Falcon Group requested that the Bankruptcy Court approve the termination of

---

[2] See PBGC Performance and Accountability Report for Fiscal Year 2005 1 (2005), available at http://www.PBGC.gov/docs/2005par.pdf.

[3] The Falcon Group emerged from bankruptcy on November 15, 2005.

2

three pension plans under the reorganization test. The Bankruptcy Court applied the test to all three plans in the aggregate and concluded that their termination was required for the Falcon Group to successfully emerge from Chapter 11.

The PBGC, which is responsible under ERISA to provide benefits to participants in terminated plans, appeals the Bankruptcy Court's decision, arguing that it was required to apply the reorganization test on a plan-by-plan basis to each of the three pension plans. The PBGC argues that under this method, one of the Falcon Group's plans, the S&J Pension Plan,[4] would not fulfill the reorganization test and therefore could not be terminated.[5] The PBGC also argues that the Bankruptcy Court erred in considering and applying the "fair and equitable" test of Section 1113 of the Bankruptcy Code in reaching its determination, as that section has no place in the termination inquiry. PBGC contends that the Bankruptcy Court's decision should be reversed and remanded with instructions to apply the appropriate test under 29 U.S.C. § 1341 to each individual plan.

In response, the Falcon Group asserts that § 1341 does not require a plan-by-plan analysis, other courts have approved the termination of multiple plans without addressing them on a plan-by-plan basis, it would be unfair and inequitable to allow the S&J Pension Plan beneficiaries to keep their plan while workers under the other plans will lose theirs, and the evidence presented at trial was that the Falcon Group could not successfully reorganize unless all three plans were terminated.

---

[4]This plan's official name is the Sellers and Josephson, Inc. Employees' Pension Plan, but the parties refer to it as the "S&J Pension Plan" and the Court will do the same.

[5]The PBGC does not appeal the Bankruptcy Court's decision concerning the Falcon Products, Inc. Retirement Pension Plan (the "Falcon Pension Plan") or the Shelby Williams Industries, Inc. Employees' Pension Plan (the "Shelby Pension Plan").

## II. Jurisdiction and Standard of Review.

District courts have jurisdiction to review appeals from bankruptcy court final orders and judgments pursuant to 28 U.S.C. § 158(a)(1). See In re Gaines, 932 F.2d 729, 731 (8th Cir. 1991). The Court therefore has jurisdiction over this matter.

This Court reviews a bankruptcy court's legal conclusions de novo and reviews the bankruptcy court's findings of fact for clear error. See In re Reynolds, 425 F.3d 526, 531 (8th Cir. 2005); In re LeMaire, 898 F.2d 1346, 1349 (8th Cir. 1990) (en banc). A finding of fact is clearly erroneous when, upon considering all the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made. LeMaire, 898 F.2d at 1349. When there are two permissible views of the evidence, the reviewing court may not deem a finding clearly erroneous simply because the reviewing court would not select the view chosen by the trier of fact. Id. Moreover, great deference is accorded factual findings that are based on an assessment of witness credibility. Id.

## III. Discussion.

### A. Application of Reorganization Test.

Title IV of ERISA establishes the standards for terminating single-employer pension plans. Under this section, plans may be terminated voluntarily by a plan sponsor, or involuntarily by the PBGC. See 29 U.S.C. §§ 1341(a)(1), 1342. An plan sponsor may voluntarily terminate a plan in two different ways. If the plan sponsor has sufficient assets to pay all benefit commitments, it may conduct a "standard termination" under 29 U.S.C. § 1341(b). If the plan sponsor does not have sufficient assets to pay all benefit commitments, it may initiate a "distress termination" under 29 U.S.C. § 1341(c).

4

In this case, the Falcon Group initiated a distress termination of its pension plans. Section 1341(c) contains several requirements which must be met to obtain approval to implement a distress termination, including that the PBGC determines the plan sponsor meets one of four "distress tests" under 29 U.S.C. § 1341(c)(2)(B). The Falcon Group sought a distress termination under the reorganization test, which is set forth in 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

The reorganization test includes four requirements which must be satisfied for a distress termination: (1) the plan sponsor must have filed a petition seeking reorganization under Chapter 11 of the bankruptcy law; (2) the bankruptcy case must not have been dismissed as of the proposed termination date; (3) the plan sponsor must submit a request for bankruptcy court approval of the plan termination to the PBGC; and (4) the bankruptcy court must determine that, "unless the plan is terminated, [the plan sponsor] will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process" and the court must approve the termination. 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

A plan sponsor cannot voluntarily terminate a plan using either the voluntary or involuntary method, however, if the termination would violate the terms and conditions of an existing collective bargaining agreement ("CBA"). 29 U.S.C. § 1341(a)(3). A plan sponsor seeking a distress termination while in bankruptcy may seek the bankruptcy court's approval to unilaterally modify or reject the CBA under 11 U.S.C. § 1113. Under this section, a plan sponsor seeking to modify a collective bargaining agreement must make a proposal to the union which "assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1).

In this case, the Falcon Group filed a motion with the Bankruptcy Court under § 1113 to modify or reject the CBA with the United Food and Commercial Workers International Union,

5

concerning the Shelby Pension Plan.[6] The Bankruptcy Court granted this motion at the conclusion of a hearing held on September 23, 2005.

In determining that the Falcon Group met the fourth element of the reorganization test, i.e., that it would be unable to pay its debts and continue in business outside chapter 11 unless the three plans were terminated, the Bankruptcy Court evaluated the Falcon Group's plans in the aggregate, and concluded it was not limited to a plan-by-plan analysis as argued by the PBGC. In reaching this conclusion, the Bankruptcy Court primarily relied on In re Kaiser Aluminum Corp., 2005 WL 735551 (D. Del. Mar. 30, 2005) ("Kaiser").

In Kaiser, the debtor moved for distress terminations of seven pension plans, all of which were covered by CBAs with various unions, and sought rejection of the CBAs under § 1113 of the Bankruptcy Code. The bankruptcy court analyzed the seven plans in the aggregate and construed § 1341 of ERISA in pari materia with § 1113 of the Bankruptcy Code in reaching its determination that a distress termination of all the plans was appropriate. The bankruptcy court concluded that an interpretation of § 1341 which would require the debtors to select which groups of employees and retirees whose pension benefits would continue and which would terminate would contravene the fair and equitable treatment provision of § 1113, and conflict with Congress' intentions for the reorganization of debtors' estates. Kaiser, 2005 WL 735551, *2. The district court affirmed, concluding that Title IV of ERISA did not mandate a plan-by-plan analysis, and that the bankruptcy court's analysis was proper. Kaiser, 2005 WL 735551, *3.

The Third Circuit Court of Appeals recently affirmed Kaiser and held that "when an employer in Chapter 11 bankruptcy seeks to terminate multiple pension plans voluntarily under the

---

[6]The Falcon Group's other plans, the Falcon Pension Plan and the S&J Pension Plan, were not contractually required by a CBA.

reorganization test, Congress intended the bankruptcy courts to apply the test to all of the plans in the aggregate." In re Kaiser Aluminum Corp., 456 F.3d 328, 347 (3d Cir. 2006). In reaching its decision, the Third Circuit rejected each of the arguments that the PBGC makes in the instant case.

The PBGC argues that the plain language of 29 U.S.C. § 1341 reflects Congress' intent to apply the distress termination requirements on a plan-by-plan basis. The Third Circuit disagreed, stating that ERISA does not explicitly state how the reorganization test applies when an employer seeks to terminate multiple plans at once. Kaiser, 456 F.3d at 336. The court rejected the contention that a plan-by-plan analysis is mandated by Title IV of ERISA because of Congress' use of the singular terms "plan" and "single-employer plan," id. at 336-37, and concluded that a plan-by-plan approach would be "unworkable":

> Furthermore, we do not think that Congress intended that its use of the singular "plan" would require a plan-by-plan approach to the reorganization test because, as the statute is currently written, such an approach is essentially unworkable. This is because the reorganization test cannot be rationally applied on a plan-by-plan basis unless a court makes basic assumptions about the order in which the plans should be considered and the status of the other plans that the employer is seeking to terminate. ERISA conspicuously fails to provide any ground rules whatsoever about how courts could employ a plan-by-plan analysis. If Congress had intended the bankruptcy courts to employ the reorganization test on a plan-by-plan basis, it would have done more than simply employ the singular form of "plan" in § 1341; it would also have provided some details about how courts are to apply such an approach. ERISA as it is currently drafted leaves open too many questions about how to engage in a plan-by-plan analysis for us to conclude that Congress envisioned such an approach in the multiplan context.

Kaiser, 456 F.3d at 337.

The PBGC argued to the Third Circuit and to this Court that "[i]t is difficult to imagine how Congress could have spoken to the 'precise question' – whether the distress termination requirements

7

apply on a plan-by-plan basis – any more clearly than it did." See PBGC Opening Br. at 15. The Third Circuit responded,

> To the contrary, we have no trouble envisioning how it could have done so. It could have used the phrase "plan-by-plan" in articulating the reorganization test, explicitly instructed courts to apply the test to each plan independently, or given even a modicum of guidance about how such an approach should be applied and what assumptions should be used in the multiplan context. Absent any such textual indicators of congressional intent, we will not read them into the statute ourselves. Instead, we adopt a construction of ERISA's reorganization test that does not lead to these problems, namely, the aggregate approach.

Kaiser, 456 F.3d at 339.

The Third Circuit concluded that using a plan-by-plan analysis would "disrupt the bankruptcy courts in their traditional role as agents of equity," id., and described how §§ 1113 and 1114 of the Bankruptcy Code require the bankruptcy court to treat all affected parties "fairly and equitably," particularly in the context of bankruptcies affecting unionized workers and employee retirement benefits. Id. at 340. The court stated it was "not unsympathetic" to the PBGC's argument that the result of applying an aggregate approach is just as unfair as terminating some plans and leaving others in place, as it is not fair or equitable to deprive employees of their pension benefits unless absolutely necessary. The court stated,

> We are not unsympathetic to this view. There is undoubtedly a tension between treating similarly situated workers alike and doing the least that is necessary for the company to emerge from bankruptcy. However, we are persuaded that, on the whole, an aggregate approach is more in line with the objectives of the Bankruptcy Code.

Kaiser, 456 F.3d at 342.

The Third Circuit rejected the PBGC's argument, also made here, that the legislative history of the amendments to Title IV of ERISA demonstrates that Congress intended to implement plan-by-plan analysis of distress terminations:

Our reading of the legislative history does not convince us that Congress mandated a plan-by-plan analysis. At most, the legislative history demonstrates that Congress had a general intent to make it more difficult for employers to terminate pensions; however, that is hardly determinative of whether, or how, the reorganization test should be applied in the multiplan context. As discussed above, we think it likely that a plan-by-plan analysis would actually increase the overall number of terminations and therefore conflict with the legislative intent on which the PBGC relies. In any event, such a general legislative purpose provides no guidance on the mechanics of applying the reorganization test workably on a plan-by-plan basis. We view the absence of any such guidance in the text of ERISA as more indicative of congressional intent than anything the PBGC has cited in the legislative record.

Kaiser, 456 F.3d at 344.

The Third Circuit rejected the PBGC's argument, also made here, that its interpretation of § 1341(c)(2) is entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), on the basis that issues relating to an employer's bankruptcy and reorganization are reserved for the bankruptcy courts, not the PBGC:

> Congress has delegated to the PBGC the power to adopt rules and regulations that are necessary to carry out the purposes of Title IV of ERISA, see 29 U.S.C. § 1302(b)(3), and the Supreme Court has accorded Chevron deference to the PBGC's interpretation of ERISA on other occasions. See PBGC v. LTV Corp., 496 U.S. 633, 652 (1990) (deferring to the PBGC's anti-follow-on policy); Mead Corp. v. Tilley, 490 U.S. 714, 725 (1989) (according Chevron deference to the PBGC's interpretation of 29 U.S.C. § 1344). However, deference to the PBGC here is improper because the PBGC has neither the expertise nor the authority to determine when a plan should be terminated under the reorganization test. Issues relating to an employer's bankruptcy and reorganization are within the expertise of bankruptcy courts, not the PBGC. Thus, ERISA grants the bankruptcy courts alone the power to determine when an employer "will be unable to pay all its debts pursuant to a plan of reorganization and ... continue in business outside of chapter 11. 29 U.S.C. § 1341(c)(2)(B)(ii)(IV). Where Congress delegates to the courts, rather than administrative agencies, the power to make determinations under a statute, Chevron deference does not apply. See United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) (holding that administrative implementation of a particular statutory provision qualifies for Chevron deference when Congress delegated authority to agency "to make rules carrying the force of law"); Murphy Exploration and Prod. Co. v. U.S. Dep't of Interior, 252 F.3d 473, 478 (D.C. Cir. 2001) (stating that "Chevron does not apply to statutes that ... confer jurisdiction on the federal courts" because "such statutes do not grant power

9

to agencies"); Bamidele v. INS, 99 F.3d 557, 561 (3d Cir. 1996) (refusing to defer to agency's interpretation of a legal issue that is the province of the courts).

Kaiser, 456 F.3d at 344-45 (parallel citations omitted).

Finally, the Third Circuit addressed the PBGC's policy arguments that "an aggregate approach to the reorganization test harms American workers who participate in ERISA plans because it subjects them to plan terminations that are economically unnecessary," id. at 346, and will negatively impact the PBGC itself by triggering more plan terminations and increasing the burdens on the PBGC, which is in an "already shaky financial position." Id. The court stated,

> We do not downplay the significance of either argument. They provide sound policy rationales for the result for which the PBGC advocates and highlight the important interests at stake in this case. Moreover, there is no question that the aggregate approach may, in some cases, lead to results that are less than ideal for workers and for the PBGC. Nevertheless, we do not sit here as a policy-making or legislative body. There are no clear answers to the difficult policy issues involved in this case and, in any event, their resolution is better left to Congress than the courts. We have taken Congress's failure to provide a shred of guidance on how to apply a plan-by-plan approach as indicative of its intent. If Congress perceives our holding to be in error, the cure is to amend ERISA.

Kaiser, 456 F.3d at 346-47 (internal citations and punctuation omitted).

The PBGC asserts that Kaiser was wrongly decided. The PBGC also attempts to distinguish Kaiser on the basis that only one of the pension plans at issue in this case was established pursuant to a CBA, while all of the plans in Kaiser were so established. The PBGC also states that the Shelby Pension Plan had already been modified in the § 1113 process before the Bankruptcy Court ruled on the distress termination motion. Thus, the PBGC contends that the concerns underlying the Kaiser court's application of Bankruptcy Code § 1113 to ERISA § 1341 – i.e., allowing debtors to choose between multiple CBAs and pension plans while in the midst of the good-faith bargaining process

10

required by § 1113 would undermine the process and that section's requirement that all parties be treated in a fair and equitable manner – were not implicated in this case.

The Court is persuaded that the Third Circuit's decision in Kaiser is well reasoned and correct and will follow it in this case. This Court is cognizant, as was the Third Circuit, that the policy arguments the PBGC makes in favor of its position raise issues of serious concern, but the Court concludes the language of the statute does not compel the result the PBGC seeks. The PBGC's attempt to distinguish Kaiser fails to recognize that it would not have been fair and equitable to the union employees covered by the Shelby Pension Plan to allow the S&J employees to maintain their benefits under the S&J Plan while the Shelby Williams Industries employees lost theirs.[7] Therefore, issues concerning the termination of both pension plans were interrelated under the facts and circumstances of this case and subject to the fair and equitable requirement of § 1113.

---

[7]This is particularly true because the Falcon Group has sold Sellers & Josephson, Inc. and terminated the S&J employees. Consequently, the outcome sought by the PBGC would result in the Falcon Group continuing to fund the S&J pension plan for persons who are no longer its employees, while terminating the pension plans of its own workers, both union and non-union.

Accordingly, the Bankruptcy Court did not err as matter of law in applying the reorganization test to the Falcon Group's three pension plans in this case.[8] The Bankruptcy Court's Order of October 26, 2005 should therefore be affirmed on this issue.

---

[8] Although the Falcon Group asserts that this appeal presents mixed questions of law and fact concerning whether the Bankruptcy Court properly applied the reorganization test to the three pension plans in the aggregate, appellant PBGC insists that only an issue of law exists – whether ERISA's distress termination criteria must be applied on a plan-by-plan basis. See PBGC Reply Brief at 3-4. Because the PBGC does not assert that the Bankruptcy Court clearly erred in its factual findings underlying the determination that the three pension plans met the reorganization test, the Court does not address that aspect of the Bankruptcy Court's decision except as follows.

To the extent the PBGC argues that the Falcon Group had sufficient assets to fund the S&J Pension Plan, see Opening Brief at 11, the Court notes that the Bankruptcy Court found, based on uncontroverted evidence, that (1) the Falcon Group would be forced to liquidate unless it could obtain a $50 million cash infusion within a few weeks (Findings of Fact, ¶¶ 16-20); (2) although the Falcon Group had sought such financing from the market, the Proposed Investors were the only ones wiling to make that investment (Findings of Fact, ¶¶ 21-28); (3) the Proposed Investors conditioned their investment on the termination of all three pension plans (id. ¶ 35); and (4) that condition was reasonable under the facts and circumstances of this case (id., ¶ 44-45).

The PBGC also cites the Bankruptcy Court's factual finding that the evidence showed there was sufficient cash flow for the Falcon Group to fund the Shelby Pension Plan and the S&J Pension Plan (Findings of Fact, ¶ 7). The PBGC failed to direct the Court's attention, however, to the Bankruptcy Court's conclusion of law rejecting the PBGC's argument that the Falcon Group could afford the minimum payments under one or both of those plans based on the Debtors' Projections, if the plans were frozen as of January 1, 2006. The Bankruptcy Court stated,

> [T]he Court rejects [the PBGC's argument] for three reasons: (a) the Debtors cannot obtain a funding waiver [from the IRS] because they have no collateral; (b) the Debtors cannot achieve their Projections without a $50 million cash infusion and they cannot obtain that infusion if the Pension Plans are not terminated; and (c) the Pension Plans should each be treated in a similar manner for the reasons set forth in Conclusions 45 and 46, below.

Conclusions of Law, ¶ 42.

12

B. **Findings Concerning Foreign Subsidiaries**.

Although the PBGC did not include this point in its statement of issues on appeal, it argues in its brief that the Bankruptcy Court's findings regarding the Falcon Group's controlled group[9] non-debtor foreign subsidiaries exceeded its jurisdiction and infringed on matters reserved to the PBGC under § 1341(c)(2)(B)(iii)(I). The PBGC states that although ERISA does require the Falcon Group and each member of the controlled group to satisfy one of the four statutory distress termination tests, the Bankruptcy Court exceeded its jurisdiction in finding that the foreign subsidiaries did not have meaningful assets and had no ability to support the pension plans, and clearly erred because there was no factual basis in the record to make any findings concerning the foreign subsidiaries. The PBGC states that ERISA has no role for the Bankruptcy Court under the business continuation test of 29 U.S.C. § 1341(c)(2)(B)(iii), which is the test that the Falcon Group asserted its foreign subsidiaries met in the distress termination application filed with the PBGC.

I.

The PBGC states that at the hearing conducted on Falcon Group's motion on October 6, 2005, counsel for the PBGC informed the Bankruptcy Court that the debtors, in their motion and reply memorandum, "continued to ask the Court to make some kind of finding with respect to the non-debtors that are not before the Court," and the Bankruptcy Court responded, "I'm not going to do it." See Appellant's Appendix, Vol. III, at 216-17. Nonetheless, the PBGC states that the

---

[9]"A contributing [plan] sponsor's 'controlled group' consists of: (1) the sponsor/employer, and (2) all other entities under "common control" with that plan sponsor. 29 U.S.C. § 1301(a)(14)(A). In turn, PBGC regulations provide that parties are under 'common control' if they qualify either as a 'controlled group of corporations' or as 'two or more trades or businesses under common control' pursuant to the terms of the Internal Revenue Code. See 29 C.F.R. § 2612.3(b)(2); see also 26 U.S.C. § 414(b) & (c)." In re Sewell Mfg. Co., Inc., 195 B.R. 180, 185 n.6 (Bankr. N.D. Ga. 1996).

13

Bankruptcy Court subsequently made extensive findings concerning the foreign subsidiaries, and suggests the Bankruptcy Court may have "simply overlooked this proposed finding among the twenty pages of proposed findings and conclusions that the Falcon Group submitted . . . ." PBGC Opening Br. at 33.

The PBGC cites In re Diversified Industries, Inc., 166 B.R. 141, 144-45 (Bankr. E.D. Mo. Nov. 19, 1993), as correctly recognizing the limited role of a bankruptcy court with respect to a distress termination relating to a non-debtor subsidiary. It also quotes In re Sewell Manufacturing Co., 195 B.R. 180, 185 (Bankr. N.D. Ga. 1996), for the proposition that the sufficiency of a debtor's distress showing, as well as the qualification of any controlled group parties, was a matter for the PBGC's consideration as it made a final determination of the debtor's right to a distress termination.

The Falcon Group responds that the PBGC's argument ignores the impact of the non-debtor foreign subsidiaries on the fundamental question whether it can afford to maintain the pension plans. The Falcon Group states that the Bankruptcy Court did not purport to usurp the PBGC's jurisdiction to determine if the foreign subsidiaries satisfy the requirements of the business continuation test, 29 U.S.C. § 1341(c)(2)(B)(iii), which applies to non-debtor members of the controlled group. Rather, the Bankruptcy Court addressed the question whether these subsidiaries had the ability to fund the obligations due to the pension plans "for the sole purpose of determining whether they could enable the Debtors to support the Pension Plans." Order at 14, Finding of Fact ¶ 36.

The Falcon Group states that the PBGC itself has argued that the foreign subsidiaries are members of the controlled group and therefore are jointly and severally liable for all pension plan obligations. Thus, if any of the foreign subsidiaries had sufficient assets to fund the pension plans, they would be required to do so and then the plans would not impose a burden on the Falcon Group,

14

which consequently could not satisfy the reorganization test of § 1341(c)(2)(B)(ii)(IV). Thus, the Bankruptcy Court's findings concerning the foreign subsidiaries were necessary for it to determine whether the Falcon Group met the reorganization test. The Falcon Group further responds that the uncontroverted evidence in the record, specifically the testimony and affidavit of Neal R. Restivo, the Vice President and Chief Financial Officer of Falcon Products, supports the Bankruptcy Court's factual findings.

The PBGC concedes in its reply brief that "the Bankruptcy Court could, for the sole purpose of making a complete determination as to whether the debtors satisfied [the reorganization test], appropriately consider all sources of income available to the debtors, including funds potentially available from non-debtor subsidiaries." PBGC Reply Br. at 19. The PBGC maintains, however, that the Bankruptcy Court exceeded its authority "to the extent that it issued its non-debtor findings as a binding determination of any non-debtor's ability to meet the Business Continuation Test," id., and the decision "must be reversed to the extent those findings purport to control any subsequent PBGC determinations as to the non-debtor controlled group members." Id. at 20.

The Court finds that the Bankruptcy Court did not err in making findings concerning the non-debtor foreign subsidiaries. The Bankruptcy Court explicitly limited its scope of its findings, stating that because the Falcon Group owns non-debtor foreign subsidiaries, it had to review the status of those entities "for the <u>sole purpose of determining whether they could enable the Debtors to satisfy the Pension Plans</u>." Order at 14, Finding of Fact ¶ 36 (emphasis added). The court then concluded that none of the foreign subsidiaries could enable the Falcon Group to satisfy the pension plan obligations. Id. The Bankruptcy Court did not issue findings with respect to any foreign subsidiary's ability to meet the business continuation test, and its Order did not "purport to control" any

15

subsequent PBGC determinations as to those entities. The PBGC concedes that the Bankruptcy Court must consider all sources of income that might be available to the Falcon Group, including funds from the non-debtor foreign subsidiaries. The PBGC's main concern appears to be the potential preclusive effect of the Bankruptcy Court's findings, but that issue is beyond the scope of this appeal.[10]

Finally, the cases on which the PBGC relies are readily distinguishable from the instant case, and do not establish that the Bankruptcy Court's findings concerning the non-debtor foreign subsidiaries were beyond its jurisdiction. In <u>Diversified Industries</u>, an issue arose as to whether the debtor was required to seek a distress termination of its pension plan under the reorganization test of § 1341(c)(2)(B)(ii), which would be a matter determined by the bankruptcy court, or if it could elect to seek a distress termination under the business continuation test of § 1341(c)(2)(B)(iii), which would be determined by the PBGC. <u>Diversified Indus.</u>, 166 B.R. at 144. A pension plan beneficiary argued that Diversified had elected the former and should be required to establish that it met the reorganization test in the bankruptcy proceeding. The bankruptcy court concluded that Diversified could seek a distress termination under the business continuation test and had elected to do so, and under those circumstances, the debtor did not have to establish before the bankruptcy court that all of the elements for a distress termination were met, as this would be a matter for the PBGC. <u>Id.</u>

---

[10]The Court discounts the PBGC's argument that the Bankruptcy Court may have made its findings concerning the non-debtor foreign subsidiaries by mistake. If the PBGC believed this to be the case, the proper recourse would have been to file an appropriate motion to amend the findings with the Bankruptcy Court, rather than to raise a speculative argument on appeal. Moreover, the merits of the PBGC's argument are doubtful. The PBGC's counsel sent an e-mail to the Bankruptcy Court on October 19, 2005 along with proposed findings of fact and conclusions of law, which specifically focused the Bankruptcy Court's attention on the propriety of the contents of paragraph 34 of the Falcon Group's proposed findings of fact and conclusion of law, which subsequently became Finding of Fact ¶ 36. <u>See</u> Appendix to Appellee's Br., Ex. 6 at 45.

The language from Diversified Industries quoted by the PBGC, that the bankruptcy court lacked jurisdiction over Diversified's wholly-owned, non-debtor subsidiary and therefore only the PBGC could determine whether the subsidiary's pension plan could be terminated, id. at 145, does not support the PBGC's position for two reasons. First, the bankruptcy court is paraphrasing the debtor's argument and is not making the statement itself; and second, the statement is inapposite because there is no contention that the Falcon Group's subsidiaries have pension plans of their own which they wish to terminate. The quoted statement was dicta, made in the context of the bankruptcy court's explanation of a "pragmatic" reason why it should not determine whether the debtor met the reorganization test, where the PBGC would be determining if the subsidiary could terminate its separate plan and opposite conclusions could be reached, thus making the debtor's reorganization much more difficult, if not impossible, to achieve. Diversified Indus., 166 B.R. at 145.

The main issue in Sewell Manufacturing was the PBGC's contention that the bankruptcy court could not make a determination regarding the financial necessity of a distress termination under § 1341(c)(2)(B)(ii)(IV) until after the debtor filed a plan of reorganization. Sewell Mfg., 195 B.R. at 182. The court rejected the PBGC's argument. Id. at 184-85. The PBGC offered a second, related argument, that companies bearing a relationship to the debtor might qualify as members of its controlled group for purposes of § 1341(c)(2)(B), and the bankruptcy court should not conduct a determination of the debtor's financial necessity to terminate its pension plan until the third parties were first definitively found to qualify as controlled group members and had satisfied any of ERISA's distress criteria. Id. at 185.

The language from Sewell Manufacturing on which the PBGC relies is part of the bankruptcy court's rejection of the PBGC's second argument, as the court concluded that the debtor's failure to

17

comply with "parallel requirements" concerning controlled group parties did not preclude the court from making a factual determination whether there was financial necessity for the plan's termination, and that issues concerning the controlled group would ultimately be a matter "for the PBGC's consideration as it makes a final determination of the Debtor's right to a distressed termination." Id. at 185. The court in Sewell Manufacturing was not faced with, and did not address, the issue whether a bankruptcy court had jurisdiction to make findings concerning the ability of controlled group subsidiaries to fund the debtor's pension plan obligations. The Sewell Manufacturing decision therefore does not support the PBGC's arguments.

For these reasons, the Court concludes that the Bankruptcy Court did not exceed its jurisdiction or err as a matter of law in making factual findings concerning the Falcon Group's non-debtor foreign subsidiaries.

**II**.

The Court now turns to the PBGC's argument that the Bankruptcy Court erred in finding that the non-debtor foreign subsidiaries lacked sufficient assets to fund the pension plans, because there was no evidence in the record to support the findings. The PBGC's argument ignores the affidavit and testimony of Neal R. Restivo that the Falcon Group owned the non-debtor foreign subsidiaries, and that the foreign subsidiaries were unable to "fund the continuation of the Pension Plans." Appellant's Appendix, Vol. II, A-368, ¶ 28. Mr. Restivo was cross-examined by counsel for the PBGC, but counsel did not ask any questions concerning the financial condition of the non-debtor foreign subsidiaries.

Based on the foregoing, the Court concludes that the Bankruptcy Court did not commit clear error in making its findings of fact concerning the non-debtor foreign subsidiaries.

**IV. Conclusion**.

For the foregoing reasons, the Court concludes that the October 26, 2005 Order of the United States Bankruptcy Court for the Eastern District of Missouri (1) determining that the financial requirements for a distress termination of the Falcon Group's three defined benefit pension plans under ERISA § 4041(c)(2)(B)(ii)(IV) are satisfied; and (2) approving the distress termination of the three pension plans, should be affirmed in all respects. The Court also concludes that the Bankruptcy Court did not exceed its jurisdiction or clearly err in making findings concerning the ability of the Falcon Group's non-debtor foreign subsidiaries to fund the Falcon Group's obligations to the three pension plans. The PBGC's request for oral argument is denied.

Accordingly,

**IT IS HEREBY ORDERED** that the October 26, 2005 Order of the United States Bankruptcy Court for the Eastern District of Missouri in this matter is **AFFIRMED**.

An appropriate order will accompany this memorandum and order.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  21st  day of September, 2006.